RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROMELL BROOM,

    *Petitioner-Appellant,*

    *v.*

    No. 03-4370

BETTY MITCHELL,

    *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00030—Kathleen McDonald O'Malley, District Judge.

Argued: November 30, 2005

Decided and Filed: March 17, 2006

Before: BATCHELDER, MOORE, and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellant. Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, for Appellant. Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

    KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant Romell Broom ("Broom") appeals the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Broom was sentenced to death in Ohio in 1985 for aggravated murder. We review the following six issues raised by Broom: *Brady* violation, admission of other acts testimony, ineffective assistance of counsel at the mitigation phase, prosecutorial misconduct, denial of a continuance, and denial of the suppression of a "show-up" identification. Broom's *Brady* claim is based upon the fact that certain police reports were not made available to Broom's counsel prior to the trial but were later obtained as a result of Ohio Public Records Act requests and as a part of federal habeas discovery. The State argues that Broom's *Brady* claim is procedurally defaulted due to the fact that the police reports were not used and the *Brady* claim was not presented during Broom's state postconviction relief proceedings. Broom responds that Ohio case law prevented him

1

from using the police records at issue and that he has demonstrated the requisite cause and prejudice such that his claim may be reviewed in spite of the procedural default.

For the reasons discussed below, we **AFFIRM** the district court's judgment denying Broom habeas relief.

## I. BACKGROUND

On September 21, 1984, Tryna Middleton ("Middleton"), Tammy Sims ("Sims"), and Bonita Callier ("Callier") were at a high school football game. Middleton was fourteen years old at the time, and she was a ninth-grade student at the high school. After the football game, the three girls began walking home, and they noticed a car that they thought looked suspicious. They walked away from the car and down a different street. A car without its lights on then came towards the girls and stopped in front of them; the driver exited the car and ran past the girls. Once the girls passed by the parked car, they heard footsteps behind them and then an assailant tried to grab all of them. In the course of the struggle with the girls, the assailant said, "Come here, bitch," and he pulled out a knife. Middleton was not able to get away from the assailant, but Sims and Callier escaped. They ran to a nearby house, where the homeowner allowed them to call their mothers and the police. Sims and Callier described the car and the assailant to the police. Approximately two hours later, Middleton's body was found in a parking lot; she had been stabbed in the chest and abdomen and there were sperm cells found in her rectum and vagina. Sims and Callier were shown a series of photographs, but were unable to identify a suspect at this point.

There were two other incidents in the same area involving young girls. On September 18, 1984, Venita McKenney ("McKenney") was walking home when a car passed her and then stopped. When McKenney walked past the car, the driver got out and grabbed her. He also threatened McKenney with a knife, and he called her a "bitch." Residents who lived nearby heard the noise, and McKenney was able to escape into their home. The other incident occurred on December 6, 1984, involving Melinda Grissom ("Grissom"). A car was following Grissom as she was walking home, and as she turned a street corner, a man passed her and then grabbed her from behind. The assailant began hitting Grissom, and he threw her into his car. Grissom's younger sister observed what happened and summoned the girls' mother, who ran outside and grabbed the car door. As her mother held on to the car, Grissom was able to escape through the passenger door. Two witnesses were able to get the license plate number of the car, which the police traced to William Broom, Broom's father. When the police arrived, Broom admitted that he had been driving the car. The police then took Broom to the hospital, where both Grissom and her mother identified him as the assailant. The other two witnesses to the incident also identified Broom in a line-up.

The similarities between these three incidents led the police to bring in the witnesses from the McKenney and Middleton cases to view a line-up. The victims and witnesses each independently identified Broom from the line-up; Sims and Callier also identified him in a photo array. The police discovered that Broom had been driving his girlfriend's car before it was wrecked on November 6, 1984, and Sims identified Broom's girlfriend's car as the one from the night of the Middleton incident. Callier stated that it was the same kind and color as the car used during the incident. Tests revealed that the sperm discovered in Middleton's vagina belonged to a person with type B blood, which is the blood type of approximately twelve percent of the population; Broom's blood is type B.

A Cuyahoga County grand jury issued an indictment charging Broom with the following: (1) aggravated murder of Middleton with specifications for murder committed during the course of a kidnaping and rape; (2) rape of Middleton; (3) kidnaping of Middleton; (4) kidnaping of Sims; (5) kidnaping of Callier; (6) kidnaping of Grissom; (7) kidnaping of McKenney; and (8) felonious

assault of Grissom.  II[1] Joint Appendix ("J.A.") at 511-17 (Indictment).  Counts Six through Eight were severed, and Broom was tried on the first five counts in proceedings that began on September 16, 1985.  The jury found Broom guilty on each of the charges, and at the end of the penalty phase, recommended a sentence of death.  II J.A. at 528-30 (Op.).  The state trial judge sentenced Broom to death in October 1985, for aggravated murder.  II J.A. at 537 (Journal Entry).  In addition, Broom was sentenced to 54-80 years of incarceration for the remaining counts.  II J.A. at 537 (Journal Entry).  The state appellate court affirmed Broom's conviction, *State v. Broom*, No. 51237, 1987 WL 14401 (Ohio Ct. App. July 23, 1987), and the state supreme court affirmed the appellate court's judgment, *State v. Broom*, 533 N.E.2d 682 (Ohio 1988).  Broom filed a petition for postconviction relief, which was dismissed on April 24, 1997.  IV J.A. at 1374-87 (J. Entry).  The state court of appeals affirmed the dismissal, *State v. Broom*, No. 72581, 1998 WL 230425 (Ohio Ct. App. May 7, 1998), and the state supreme court denied Broom leave to appeal, *State v. Broom*, 699 N.E.2d 946 (Ohio 1998) (Table).

On June 21, 1999, Broom filed a federal habeas petition in the United States District Court for the Northern District of Ohio.  I J.A. at 17-151 (Pet'r Romell Broom's Pet. for a Writ of Habeas Corpus).  The district court held an evidentiary hearing in January 2002 on the ineffective-assistance-of-counsel claim and the *Brady* claim.  XVIII J.A. at 8126-517 (Evidentiary Hr'g Tr.).  The district court filed an order and opinion on August 28, 2002, in which it denied habeas relief as to each of the issues presented.  I J.A. at 165-296 (Mem. & Order at 1-132).  A certificate of appealability was granted as to the following issues:  admission of other acts testimony, ineffective assistance of counsel during the mitigation phase, *Brady* violation, inadequate time for Broom's counsel to prepare for trial, and denial of the suppression of the "show-up" identification by the Grissoms.  I J.A. at 296-300 (Mem. & Order at 132-36).  Broom filed a timely notice of appeal.  We issued a certificate of appealability for the additional issue of prosecutorial misconduct.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo the district court's findings of law, and we review for clear error its findings of fact.  *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001).  Broom filed his habeas petition after April 24, 1996 — the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") — and the provisions of that act thus apply in this case.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  If a claim was "adjudicated on the merits in State court proceedings," a writ of habeas corpus may be granted pursuant to AEDPA if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In applying § 2254(d), we adhere to the following guidelines set forth by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[1]The number preceding "Joint Appendix" indicates the volume number.

"A federal habeas court may not find a state adjudication to be 'unreasonable' 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 947 (2001).

## B. *Brady*

Broom claims that the State violated his due process rights according to the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to reveal material[2] gathered by the police in the course of investigating the Middleton case.[3] *Brady* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has explained that there are "three components of a true *Brady* violation":

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Broom did not present his *Brady* claim to the Ohio state courts, and the State asserts that the claim is procedurally defaulted.[4] Appellee Br. at 25. Before we can analyze the merits of this issue, we must first determine whether Broom's failure to raise the claim in the state court proceedings precludes federal court review.

### 1. Exhaustion

Broom first argues that his *Brady* claim should not be barred because "Ohio did not have an available corrective procedure for presenting a *Brady* claim revealed for the first time in public records obtained under the Ohio public records statute." Br. Appellant at 35. This argument is based on the Ohio Supreme Court case *State ex rel. Steckman v. Jackson*, 639 N.E.2d 83, 96 (Ohio 1994), which held that "a defendant in a criminal case who has exhausted the direct appeals of his or her conviction may not avail herself or himself of R.C. 149.43[5] to support a petition for postconviction relief." It is true that a failure to exhaust will not prevent a federal court from addressing a claim in a habeas case if "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i). However, Broom's argument conflates exhaustion and procedural

---

[2] The material at issue included evidence that the three girls had been known to accept rides from men they did not know, that they had used drugs on the night of the incident, that the girls did not make any noise while Middleton was taken away, and that "Warren Hill [the resident who let Sims and Callier use his telephone] did not believe the girls' 'abduction' story when they first came to his house." Appellant Br. at 49. This evidence was contained in East Cleveland Police Department ("ECPD") Reports. XII J.A. at 5435-594 (ECPD Documents).

[3] Three departments worked on the Middleton case: the Cleveland Police Department, the East Cleveland Police Department, and the Federal Bureau of Investigation. I J.A. at 177-79 (Mem. & Order at 13-15).

[4] Broom concedes that he "did not first present his *Brady* claim to the Ohio state courts." Appellant Br. at 30.

[5] Section 149.43(B)(1) of the Ohio Revised Code states as follows:
Subject to division (B)(4) of this section, all public records shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours. Subject to division (B)(4) of this section, upon request, a public office or person responsible for public records shall make copies available at cost, within a reasonable period of time. In order to facilitate broader access to public records, public offices shall maintain public records in a manner that they can be made available for inspection in accordance with this division.

default, and it fails to recognize that procedural default may prevent him from raising his claim in federal court even if exhaustion does not technically bar the claim.

The Supreme Court has explained that "the problem of waiver is separate from the question whether a state prisoner has exhausted state remedies." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *see also Thomas v. Woolum*, 337 F.3d 720, 731 (6th Cir. 2003) ("Procedural default is . . . distinct from the exhaustion requirement, an additional requirement added on top of exhaustion."). The Court explained that "Section 2254(b) requires habeas applicants to exhaust those remedies 'available in the courts of the State.' This requirement, however, refers only to remedies still available at the time of the federal petition."[6]  *Engle*, 456 U.S. at 125 n.28. In *Engle*, the respondents were in essentially the same position as Broom, because they "completed their direct appeals" and they were prevented by Ohio law from raising a claim "that could have been litigated before judgment or on direct appeal." *Id*. (citing Ohio Revised Code § 2953.21(A)[7]). The Court concluded as follows: "Since respondents could have challenged the constitutionality of Ohio's traditional self-defense instruction at trial or on direct appeal, we agree with the lower courts that state collateral relief is unavailable to respondents and, therefore, that they have exhausted their state remedies with respect to this claim." *Id*. The *Engle* opinion instead analyzed whether or not there was cause and prejudice to excuse the petitioner's procedural default. *Id*. at 124-35. As in *Engle*, Broom is unable to satisfy the narrow requirements to bring a second postconviction petition in the Ohio state courts, and there is no longer an available state court remedy.[8]  I J.A. at 207-08 (Mem.

---

[6]Justice Stevens elaborated on the difference between the two doctrines in his dissenting opinion in *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). The exhaustion doctrine "requires federal courts to ask whether an applicant for federal relief could still get the relief he seeks in the state system. If the applicant currently has a state avenue available for raising his claims, a federal court, in the interest of comity, must generally abstain from intervening." *Boerckel*, 526 U.S. at 851 (Stevens, J., dissenting). Justice Stevens concluded that

> The presence or absence of exhaustion, in sum, tells us nothing about whether a prisoner has defaulted his constitutional claims. Exhaustion is purely a rule of timing and has played no role in the series of waiver decisions that foreclosed challenges to the composition of the grand jury, evidentiary rulings at trial, instructions to the jury, and finally, counsel's inadvertent error in failing to file a timely appeal from a state court's denial of collateral relief. The Court's reasons for progressively expanding its procedural default doctrine were best explained in the cases that arose in a trial setting. By failing to raise their constitutional objections at trial, defendants truly impinge state courts' ability to correct, or even to make a record regarding the effect of, legal errors.

*Id*. at 856 (Stevens, J., dissenting). *See also id*. at 848 (majority) ("[W]e do not disagree with [Justice Stevens's] description of the interplay of these two doctrines.").

[7]Section 2953.21(A)(1)(a) states:

> Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States . . . may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

Subsection (A)(4) explains that "[a] petitioner shall state in the original or amended petition filed under division (A) of this section all grounds for relief claimed by the petitioner. Except as provided in section 2953.23 of the Revised Code, any ground for relief that is not so stated in the petition is waived."

[8]According to Ohio Revised Code § 2953.23(A)(1), Broom is unable to submit a second petition for relief unless the following two requirements are satisfied:

> (a)    Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.
>
> (b)    The petitioner shows by clear and convincing evidence that, but for constitutional error at trial,

& Order at 43-44).  Thus, exhaustion is not an issue before us, and we need only analyze Broom's *Brady* claim with regard to procedural default.

### 2. Procedural Default

We have explained the doctrine of procedural default as follows:

> When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour*, 224 F.3d at 549-50 (citing *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977)).  Broom was entitled to raise his *Brady* claim in the Ohio state courts pursuant to Ohio Revised Code § 2953.21(A)(1)(a), and because he did not do so, the claim is procedurally defaulted.  Procedural default may be avoided "only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case."[9]  *Seymour*, 224 F.3d at 550 (citing *Sykes*, 433 U.S. at 87).

The *Sykes* opinion "plainly implied that default of a constitutional claim by counsel pursuant to a trial strategy or tactical decision would, absent extraordinary circumstances, bind the habeas petitioner even if he had not personally waived that claim." *Murray v. Carrier*, 477 U.S. 478, 485 (1986) (citing *Sykes*, 433 U.S. at 91 n.14).  The *Carrier* Court elaborated on the meaning of "cause": "we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 488.  The Court "not[ed] that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials,' made compliance impracticable, would constitute cause under this standard." *Id*. (internal citations omitted).  Ineffective assistance of counsel may constitute cause, but "a claim of ineffective assistance [must generally] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id*. at 488-89.

Broom offers several arguments as to why there was cause for the procedural default of his *Brady* claim.  We will discuss each of these arguments in turn below.

---

> no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

The district court concluded that Broom could not satisfy part (a) of this test.  I J.A. at 207 (Mem. & Order at 43).  Neither party has contested this determination.

[9] Broom does not argue that a miscarriage of justice will result from enforcing the procedural default in his case.

### a. *Steckman*

First, Broom argues that the Ohio Supreme Court's decision in *Steckman* foreclosed the use of records that were obtained while Broom's petition for state postconviction relief was pending.[10] In *Steckman*, the Ohio Supreme Court analyzed various aspects of public-records litigation in the context of criminal proceedings; one of the issues in the case involved a defendant's effort to acquire police records for purposes of seeking postconviction relief. *Steckman*, 639 N.E.2d at 95-96. The court stated that the records in question were "exempt from disclosure based upon the work product exception" of the public-records statute. *Id*. at 96. *Steckman* concluded that "a defendant in a criminal case who has exhausted the direct appeals of her or his conviction may not avail herself or himself of R.C. 149.43 to support a petition for postconviction relief." *Steckman*, 639 N.E.2d at 96.

There are two Ohio Court of Appeals decisions interpreting *Steckman*'s rule to be a strict bar against any use of public records in the course of seeking postconviction relief; these cases therefore support Broom's assertion that *Steckman* prevented his use of the police records in his possession. *See State v. Walker*, 657 N.E.2d 798, 800 (Ohio Ct. App. 1995) ("[T]he police reports which figure prominently in Walker's second petition could not have been considered by the trial court even had it elected to entertain Walker's petition because Walker had obtained those reports through the Public Records Act."); *State v. Storer*, No. 94-CA-07, 1994 WL 667186, at * 2 (Ohio Ct. App. Nov. 4, 1994) ("[W]e believe that the rule of [*Steckman*] requires us to reject materials obtained through an R.C. 149.43 public records request as a basis for a motion for new trial."). As the district court noted, "[b]oth *Walker* and *Storer*, out of the Second District, cursorily rejected any use of these public records to support a petition for post-conviction relief." I J.A. at 209 (Mem. & Order at 45).

However, the State contends that *Steckman* did not preclude Broom from using the records in his postconviction relief proceedings for several reasons, namely that Broom had received all of the relevant records prior to the decision in *Steckman* and that Ohio case law did not bar claims based on records obtained prior to *Steckman*. Appellee Br. at 26-32. With regard to the first of these arguments, the State claims that *Steckman* is irrelevant because "Broom still fails to account for the pre-*Steckman* accumulation of 1,485 pages of public records that he had an unquestionable right to use." Appellee Br. at 31. However, only 19 pages of this were the relevant East Cleveland Police Department ("ECPD") reports,[11] and these pages were apparently received a matter of months before *Steckman*.[12] Broom argues that he "cannot be held to have defaulted his *Brady* claim, for failing to file it in the substantially smaller window of opportunity left to him once the State began to trickle out the discoverable records." Appellant Br. at 39. Broom may be correct that he should

---

[10] Broom filed a petition for state postconviction relief in 1990. III J.A. at 993-1114 (Pet. to Vacate or Set Aside Sentence).

[11] Both parties agreed at oral argument in this court that only 19 pages of the 165 total pages of ECPD reports were in the possession of Broom's counsel prior to *Steckman*. *See also* Appellant Br. at 21 n.3. The pages that Broom's counsel received include reports based on interviews with individuals who knew the three girls or who had seen them on the night of the murder; these reports provide evidence that the girls may have been drinking alcohol and smoking marijuana on the night of the murder, that Middleton may have gotten into cars with men she did not know on previous occasions, and that there were rumors that all three of the girls initially got in the car with Broom but that Callier and Sims later escaped. V J.A. at 2153-58, 2410-19 (ECPD Supplementary Reports).

[12] At the evidentiary hearing held at the district court, Broom's trial counsel Richard Vickers ("Vickers") testified that the ECPD reports were received in 1993-1994. XVIII J.A. at 8148 (Evidentiary Hr'g Tr. at 23) (Vickers Test.). At oral argument in this court, Broom's attorney stated that Vickers only had these records for a "few months" before *Steckman* was decided in September 1994.

not be penalized for failing to file another petition based on the police reports prior to *Steckman*;[13] however, we are still left with the question of whether *Steckman* was sufficient cause for his failure to do so at a later point. The State asserts — and the district court agreed — that Ohio law was unsettled as to the question of whether or not Broom could have filed another petition (or amended his pending petition)[14] post-*Steckman*, and we turn now to that key issue.

The State and the district court both relied on *State v. Apanovitch*, 667 N.E.2d 1041 (Ohio Ct. App. 1995) as support for the fact that Broom was not barred from bringing his claim in the Ohio state courts.[15] Appellee Br. at 29-30; I J.A. at 209 (Mem. & Order at 45). In *Apanovitch*, the petitioner argued that the state trial court had improperly prevented him from seeking further discovery in the course of his postconviction relief, and the state court of appeals found that Apanovitch's previous public-records request pursuant to § 149.43 barred him from seeking the same materials because the issue had already been litigated. *Apanovitch*, 667 N.E.2d at 1051. The *Apanovitch* court noted the *Steckman* and *Walker* decisions, but concluded that "[w]e have no occasion to consider the import of these decisions, since the successor petition for postconviction relief predated *Steckman*, and then-applicable law permitted the use of the Public Records Act." *Apanovitch*, 667 N.E.2d at 1051-52. Broom distinguishes *Apanovitch* on the basis that the petitioner in that case had already filed his claim based on public records at the time that *Steckman* was decided, whereas Broom had not filed a claim based on the police records at that time. Appellant Br. at 37 n.9. The State responds that "the timing of Apanovitch's filing does not necessarily show that it predated the Ohio Supreme Court's September 7, 1994 *Steckman* decision." Appellee Br. at 29. This statement is based upon testimony of a prosecutor, who worked on the *Apanovitch* case, that was given during the federal evidentiary hearing in Broom's case.[16] XVIII J.A. at 8503-04 (Evidentiary Hr'g Tr. at 378-79) (Frey Test.).

Regardless of the timing of the filing in the *Apanovitch* case, that case supports the general proposition that *Steckman* may not bar the use of records already in the petitioner's possession. Rather, *Steckman* may only bar efforts to obtain new information pursuant to the public-records statute during postconviction proceedings. Because *Steckman* does not directly address this issue, there was a reasonably available "legal basis" for Broom either to file another petition for postconviction relief or to amend the petition that he had already filed. *Carrier*, 477 U.S. at 488. A 2003 Ohio Court of Appeals decision highlights the ambiguity of the *Steckman* rule because it held that "*Steckman* 'addresses only the duty to respond to defendant's request for certain documents, it addresses not at all, the admissibility of information contained in these documents at hearing.'" *State v. Larkins*, No. 82325, 2003 WL 22510579, at *3 (Ohio Ct. App. Nov. 6, 2003).

---

[13]Prior to 1995, Ohio law imposed no time limits for filing a petition for postconviction relief. OHIO REV. CODE § 2953.21(A). Broom was thus under no obligation to have filed his petition prior to *Steckman*. In 1995, however, the statute was amended, and the current version imposes a 180-day deadline for such filings. § 2953.21(A)(2). If the "direct appeal involves a sentence of death," the 180-day period commences on "the date on which the trial transcript is filed in the supreme court." § 2953.21(A)(2).

[14]Section 2953.21(F) states as follows: "At any time before the answer or motion is filed, the petitioner may amend the petition with or without leave or prejudice to the proceedings. The petitioner may amend the petition with leave of court at any time thereafter."

[15]*Apanovitch* was decided in the Eighth District of the Ohio Court of Appeals, the same district in which Broom's case was litigated.

[16]The prosecutor stated that Anthony Apanovitch filed a second successor petition for postconviction relief in August 1995 that contained Cleveland police records and that was considered on the merits by the courts. XVIII J.A. at 8505 (Evidentiary Hr'g Tr. at 380) (Frey Test.).

In *Larkins*, the petitioner's request for a writ of mandamus seeking police records was denied,[17] but a third party obtained the relevant records through a public-records request. *Id*. at *2. The petitioner then used the police records to file a motion for a new trial, and after the motion was granted, the State argued that this was incorrect in light of *Steckman*. *Id*. The court of appeals affirmed the trial court, explaining that "*Steckman* is inapplicable to the instant case." *Id*. at *3. Although Broom argues that "[r]easonable counsel, like the Ohio Courts of Appeal that applied it, read *Steckman* as a prohibition," Appellant Br. at 38, the Supreme Court has stated that "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it,[18] does not constitute cause for a procedural default," *Carrier*, 477 U.S. at 486. We thus conclude that the *Steckman* decision does not constitute cause for Broom's procedural default of his *Brady* claim.

### b. State delay

Broom argues that "[t]imely release by the State would have allowed discovery of the *Brady* issue long before *Steckman* was decided." Appellant Br. at 39. Broom had 19 pages of the relevant material in his possession prior to *Steckman*, even if by only a few months. XVIII J.A. at 8148 (Evidentiary Hr'g Tr. at 23) (Vickers Test.). Broom's counsel conceded at our oral argument that the relevant information was present in the 19 pages, but he asserted that Broom's postconviction counsel did not realize the extent of the evidence available. The fact that there might have been more information available is insufficient to establish cause for failing to bring a *Brady* claim in the state courts. Furthermore, we note that because *Steckman* should not have prevented Broom's counsel from filing a claim on his behalf, the fact that the pertinent information was received shortly before the *Steckman* decision is irrelevant.[19]

### c. Postconviction judge's instructions

The lawyers involved in Broom's postconviction proceedings testified at the evidentiary hearing to the fact that state trial "Judge Matia clearly expressed his displeasure over the fact that Broom's postconviction counsel had filed a number of pleadings in the case." Appellant Br. at 40; *see also* IV J.A. at 1857 (Vickers Aff.) ("It appeared to me that Judge Matia seemed distressed that we had filed numerous pleadings. The inference that I drew from this meeting was that Judge Matia was displeased with the manner in which we were litigating Mr. Broom's case. Based on the meeting I formed the opinion that it would be futile for us to file any future legal documents on Mr. Broom's behalf."). Broom concedes that Judge Matia's remarks may have been "merely

---

[17]Larkins's mandamus request was one of the three cases consolidated in the *Steckman* opinion. *Larkins*, 2003 WL 22510579, at *2.

[18]The State raised the idea at oral argument before this court that Broom's trial counsel may have deliberately chosen not to file the *Brady* claim, and that *Steckman* was offered as a belated excuse for the failure to do so. Vickers first mentioned at the federal evidentiary hearing that the *Steckman* decision was a motivating factor for not filing a *Brady* claim with the state courts. XVIII J.A. at 8162-63 (Evidentiary Hr'g Tr. at 37-38) (Vickers Test.). Prior to the federal evidentiary hearing, Vickers filed at least one affidavit stating that he did not file a claim because he believed that Judge Matia — who was the state trial judge in Broom's case — would not have been receptive to further filings. XVIII J.A. at 8161-62 (Evidentiary Hr'g Tr. at 36-37) (Vickers Test.). Vickers also testified that he thought that the documents might be of more use to Broom during his federal habeas litigation. XVIII J.A. at 8154-55 (Evidentiary Hr'g Tr. at 29-30) (Vickers Test.).

[19]Broom's postconviction counsel received the documents by 1994, at which point there was no time limitation on filing a petition for postconviction relief pursuant to § 2953.21(A). Vickers testified that when the law changed in 1995 to impose a deadline for such filings, the public defenders went through "the files of all existing post-conviction cases in the office," including Broom's files. XVIII J.A. at 8150 (Evidentiary Hr'g Tr. at 25) (Vickers Test.). Thus, Broom's counsel had ample time to file the *Brady* claim after *Steckman* was decided.

informative." Appellant Br. at 40.  Even if such remarks could constitute cause for failing to present a claim to the state court, this argument is precluded by the fact that Judge Matia had left the state court to take a position on the federal bench by 1992, well before the relevant records were received in 1993-1994.  XVIII J.A. at 8153 (Evidentiary Hr'g Tr. at 28) (Vickers Test.).

### d.  Due diligence of counsel

Finally, Broom argues that "[d]ue diligence does not require counsel to file pleadings or seek relief in direct contradiction of the law."  Appellant Br. at 41.  This is merely a restatement of the *Steckman* argument, which we discussed above.

As Broom has not shown the requisite cause to excuse the procedural default of this claim, we will not examine whether he has shown the requisite prejudice, nor will we proceed to the merits of Broom's *Brady* claim.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986) ("We need not determine whether petitioner has carried his burden of showing actual prejudice from the allegedly improper admission of Dr. Pile's testimony, for we think it self-evident that he has failed to demonstrate cause for his noncompliance with Virginia's procedures.").  We affirm the district court's judgment denying habeas relief as to this issue.

## C.  "Other Acts" Evidence

The state trial court permitted the introduction of evidence regarding the incidents involving Venita McKenney and Melinda Grissom; Broom asserts that this admission of "other acts" evidence denied him his constitutional rights to due process and a fair trial.  Appellant Br. at 59.

In *Huddleston v. United States*, 485 U.S. 681, 691 (1988), the Supreme Court discussed the circumstances under which the admission of other acts evidence is proper:

> We share petitioner's concern that unduly prejudicial evidence might be introduced under [Federal Rule of Evidence 404(b)].[20]  We think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources:  first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402 — as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to

---

[20]Federal Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Ohio Rule of Evidence 404(B) is substantially similar to the federal rule:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ohio Rule of Evidence 404(B) and Ohio Revised Code § 2945.59 together "codify an exception to the common law with respect to evidence of other acts of wrongdoing." *Broom*, 533 N.E.2d at 689-90. Section 2945.59 states:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Huddleston*, 485 U.S. at 691 (internal citations omitted). In reviewing this claim, we note that "[t]rial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991)), *cert. denied*, 543 U.S. 892 (2004). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

The Ohio Supreme Court began its discussion of this issue by stating as follows:

We note that appellant was positively identified either in a lineup or a showup and in the courtroom by both of the victims and numerous witnesses to those two incidents. The jury was given a carefully drafted limiting instruction to explain that the evidence concerning those two incidents was admitted only for the purpose of considering whether those acts tended to show intent, motive, scheme, plan or system for the September 21 and 22 kidnapping, rape, and murder of Tryna Middleton and attempted kidnapping of Tammy Sims and Bonita Callier.[21]

*Broom*, 533 N.E.2d at 689. At trial, Broom asserted that this was a case of "mistaken identity because he allegedly was with someone else the night that Tryna died." *Broom*, 533 N.E.2d at 690. The state supreme court explained that "[i]f the other act does in fact 'tend to show' by substantial proof any of those things enumerated, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, then evidence of the other act may be admissible." *Id*. "The issue of identity, although not listed in [§ 2945.59], has been held to be included within the concept of scheme, plan, or system." *Id*. at 689 (citing *State v. Curry*, 330 N.E.2d 720, 725-26 (Ohio 1975)). In *Curry*, the Ohio Supreme Court explained that:

One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes.

*Curry*, 330 N.E.2d at 726. In Broom's case, the state supreme court applied the test set forth in *Curry* and concluded as follows:

All three incidents occurred within a few months of each other, within a few miles of each other, and all involved young girls between the ages of eleven and fourteen walking along a street after dark. The method in all three incidents was identical:

---

[21]The state trial judge instructed the jury that

Evidence has been introduced of other acts by the Defendant. Such evidence, if true, has a limited purpose. You may consider the Defendant's other acts if and when those other acts tend to show his intent or motive, or his scheme, plan, or system in doing the acts charged in this trial. Such evidence of other acts must not be considered for any other purpose.

XVII J.A. at 7914 (Tr. at 1823).

a lone driver in a car passed the victims, parked the car and then attacked them from behind, trying to get the victims into the car while using the same scurrilous language. Two of the incidents involved the same car and a knife. We view the evidence of the other incidents as admissible because it is relevant to the issue of appellant's defense of mistaken identity.

*Broom*, 533 N.E.2d at 690.

The district court stated that "[w]hile the [c]ourt has some concerns about the decision to admit this evidence, the [c]ourt cannot say that the state court's view of it — that it was directly probative of the credibility of Broom's alibi defense — was unreasonable." I J.A. at 204 (Mem. & Order at 40). In addition, the district court found that "in light of the substantial other direct evidence tying Broom to the Tryna Middleton murder — including eyewitness identification — the admission of this other act evidence did not so materially affect the outcome of the trial as to render it fundamentally unfair." I J.A. at 204 (Mem. & Order at 40) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). We agree with the district court that the state court's decision was not objectively unreasonable, and we affirm the district court's judgment denying habeas relief as to this issue.

## D. Ineffective Assistance of Trial Counsel

Broom argues that his trial counsel was constitutionally ineffective during the mitigation phase of his trial.[22] Appellant Br. at 65. As support for this claim, he states that his counsel did not adequately investigate his background; that the mitigation expert assigned to his case did not provide any services for him; that no effort was made to secure further psychiatric evaluation after Broom did not open up to the psychiatrist who was sent to interview him; that his counsel "made him appear dishonest and predatory" by allowing evidence of his prior convictions to be introduced through cross-examination of his father; and that his counsel attempted to use "residual doubt" as a mitigating factor even after it no longer made sense to do so. Appellant Br. at 65-70.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[23] *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In *Strickland*, the Supreme Court articulated a two-part test for determining whether counsel was constitutionally ineffective:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

---

[22] It appears that Broom raised an ineffective-assistance-of-counsel claim in his state postconviction petition, but that it was rejected on the basis of res judicata. *See* IV J.A. at 1389, 1406 (Merit Br. of Appellant) (noting that the state trial court dismissed Broom's postconviction case on October 31, 1996, and arguing that the "trial court erred in dismissing Mr. Broom's claims of ineffective assistance of counsel during both phases of his capital trial"); *State v. Broom*, No. 72581, 1998 WL 230425, at *1-2 (Ohio Ct. App. May 7, 1998) (upholding the dismissal on the basis of res judicata). However, the State did not argue that the claim was procedurally defaulted, and the district court thus addressed it on the merits. I J.A. at 271 (Mem. & Order at 107).

[23] The same test is applied to the sentencing phase of a capital case as to the guilt phase. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

*Strickland*, 466 U.S. at 687. "A counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003)).

The district court — applying the *Strickland* standard — concluded that "although Broom may have benefitted from some psychiatric explanation of the impact of his upbringing on his psyche, his counsel were not objectively unreasonable in failing to present this testimony because most, if not all, was presented in some form during mitigation." I J.A. at 274 (Mem. & Order at 110). The district court elaborated that "[w]ith the exception of parental drug and alcohol abuse, all other factors — the physical violence, marital infidelities, the inconsistent forms of discipline, and the fact that Broom was forced to drop out of school to care for his younger siblings — were all presented during trial."[24] I J.A. at 274 (Mem. & Order at 110). Furthermore, during the federal evidentiary hearing, "Broom's habeas counsel were unable to articulate what further factual mitigation would have been proferred." I J.A. at 274 (Mem. & Order at 110). The district court concluded that the state postconviction court did not unreasonably deny Broom's claim of ineffective assistance of counsel pursuant to *Strickland*.[25] I J.A. at 277 (Mem. & Order at 113). We agree with this conclusion.

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. In preparation for Broom's trial, Broom's attorneys set up an appointment for Broom to meet with a psychiatrist, they spoke with members of Broom's family, and they collected records from the welding school that Broom attended as well as from the prison. XVIII J.A. at 8212-15 (Evidentiary Hr'g Tr. at 87-90) (Brusnahan Test.). One of Broom's trial attorneys explained that the main goals of the defense at mitigation were to keep the fact of Broom's prior rape conviction from the jury, and to establish that

> Romell was the product of a very dysfunctional familiarly [sic] background; that he had a very difficult early childhood; that he had witnessed a number of things that were very unpleasant to say the least about the relationship between his mother and his father when he was growing up; that he was quite a reserved young man; that he did very well when he applied himself.

---

[24] Ella Mae Broom (Broom's mother) testified that her children were aware that her husband had numerous extramarital affairs, that they witnessed fighting and abuse between her and her husband, and that Broom dropped out of school in the tenth grade and cared for his siblings. XVIII J.A. at 8033-38 (Trial Tr. at 1942-47) (Ella Mae Broom Test.). She also stated that Broom's sister was stabbed and killed in 1984. XVIII J.A. at 8031 (Trial Tr. at 1940) (Ella Mae Broom Test.).

[25] The district court cited the following statement from the state postconviction court:
The record, specifically the trial court's opinion, clearly shows that counsel had presented ample evidence of petitioner's family history and social background by testimony from petitioner's father, mother and teacher. Petitioner himself gave an unsworn statement during the penalty phase of the trial. Counsels [sic] breached no essential duties to their client; in fact, their presentation of the defendant's witnesses prior to the mitigation phase demonstrated their dedication to the defendant's case. Nothing in the record demonstrates that trial counsels' [sic] efforts in this regard were below "an objective standard of reasonableness." *Strickland*, *supra*.
I J.A. at 276 (Mem. & Order at 112) (quoting *State v. Broom*, No. CR196643, slip op., at 18-19 (Ohio Ct. Common Pleas Apr. 24, 1997)).

XVIII J.A. at 8217-18 (Evidentiary Hr'g Tr. at 92-93) (Brusnahan Test.). To that end, the jury heard testimony from Broom's mother, father, and a counselor from the welding school. XVIII J.A. at 8017-8062 (Tr. at 1926-71). One of his attorneys testified at the federal evidentiary hearing that there were more sources of information to explore, but that there was no time to do so in light of the state trial court's denial of their request for a continuance. XVIII J.A. at 8215 (Evidentiary Hr'g Tr. at 90) (Brusnahan Test.).

It is clear, as stated above, that Broom's counsel could have gathered additional information in order to present a more complete picture of Broom's difficult background. However, we are not convinced that his counsel's performance was constitutionally inadequate. This is not a case in which counsel was or should have been alerted to additional probative evidence about the petitioner, and the counsel then failed to research the evidence. *See, e.g.*, *Rompilla v. Beard*, 125 S. Ct. 2456, 2467 (2005) ("Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case."). A comparison to our decision in *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005), illustrates this difference as well. In *Harries*, we held that

> [W]e cannot escape the conclusion that Harries's counsel failed to conduct a constitutionally adequate investigation. Counsel limited their investigation to contacting by telephone Harries's mother and brother, sending requests for information to some of the institutions in which Harries had been confined, and interviewing Harries, Harries's codefendant, and two state witnesses. Although counsel requested two court-ordered competency evaluations, they declined to seek the assistance of a mental health expert or conduct a thorough investigation of Harries's mental health, even after Harries's mother alerted them that Harries suffered from mental illness. Nor did counsel adequately investigate Harries's family background, despite indications of Harries's troubled childhood.

*Id.* Broom's counsel did not do a great deal more than counsel in *Harries*, but they also did not refuse expert assistance or ignore signs of mental illness. Rather, Broom's counsel attempted to obtain psychological testimony[26] as well as the services of a mitigation expert, in addition to contacting his family members, his school, and the prison. Their actions were not objectively unreasonable.

Even if Broom's counsel's performance at the mitigation phase of his trial was deficient, he cannot satisfy the prejudice prong of the *Strickland* test. "To satisfy the prejudice prong, a petitioner must prove that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Harries*, 417 F.3d at 637. The additional evidence that Broom identifies elaborates his difficult childhood as was described by his mother at the trial.[27] We have held that the failure to present additional mitigating evidence that is "merely cumulative" of that already presented does not rise to the level of a constitutional violation. *Clark*, 425 F.3d at 286; *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.), *cert. denied*, 126 S. Ct. 744 (2005); *Smith v. Mitchell*, 348 F.3d 177, 202 (6th Cir. 2003), *cert. denied*, 543 U.S. 1016 (2004). "[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial

---

[26]While ideally Broom's counsel would have attempted to secure another psychological expert when Broom refused to open up to the first expert, it is not clear that Broom would have cooperated with another psychiatrist or psychologist even if one had been available.

[27]This additional evidence includes the fact that Broom was placed in a juvenile detention facility as a teenager, that a close friend of Broom's was shot and killed, and that Broom's father was a pimp. Appellant Br. at 67.

way — in strength and subject matter — from the evidence actually presented at sentencing." *Clark*, 425 F.3d at 286 (quoting *Hill*, 400 F.3d at 319).

Broom argues that "[a] psychological evaluation, social history, and thoughtful preparation would have allowed a mitigation case to be presented that explained Broom's prior conviction [for rape] and the other acts evidence admitted at trial in the context of his life history."[28] Appellant Br. at 68. In *Martin v. Mitchell*, 280 F.3d 594, 614 (6th Cir.), *cert. denied*, 537 U.S. 1004 (2002), the "defense counsel did not produce expert testimony to draw conclusions from the facts presented by . . . two witnesses [family members]," but we noted that the underlying "facts and occurrences" were all presented to the jury and the petitioner's counsel was therefore not constitutionally ineffective. We agree that Broom's counsel should have taken greater pains to provide some context for the jury; however, the additional evidence that could have been presented simply does not substantially differ from the evidence actually presented so as to undermine confidence in the outcome of Broom's trial.[29]

The district court also noted that Broom's claim of ineffective assistance of counsel with regard to the examination of his father and Broom's prior rape conviction is without merit because of the court's conclusion that there was "no constitutional violation in the trial court's decision to permit cross-examination of William Broom." I J.A. at 277, 204 (Mem. & Order at 113, 40). The State points out that the jury was already aware that Broom had spent time in prison, and Broom himself referenced his prior rape conviction in his unsworn statement given during the mitigation phase. XVIII J.A. at 8053, 8065 (Tr. at 1962, 1974). Regardless of whether or not it was error for Broom's counsel to "open[] the door" to this testimony," Appellant Br. at 68, Broom cannot satisfy the prejudice prong of the *Strickland* test because the information regarding his prior rape conviction was independently revealed to the jury.

## E.  Prosecutorial Misconduct

Broom claims that "[t]he prosecutorial misconduct in this case was egregious, pervasive and prejudicial." Br. Appellant at 70. He first lists several examples of statements from the guilt phase of his trial, including a statement that the prosecutor was not withholding evidence,[30] the characterization of Broom as a "serial killer,"[31] the description of the sexual conduct evidence as "proof of the victim's rape," and a false statement that Middleton was raped "vaginally and

---

[28]At the federal evidentiary hearing, one of Broom's trial attorneys discussed the admission of the evidence regarding Broom's prior rape conviction: "[I]t was such a damning piece of evidence that I think at that point, whatever mitigation we were putting forward, was pretty much a futile effort. I don't think there was any question in anybody's mind once that came out that this mitigation was going nowhere." XVIII J.A. at 8346 (Evidentiary Hr'g at 221) (Rossman Test.).

[29]Broom submitted an expert report by Dr. Nancy Schmidtgoessling at the federal evidentiary hearing that provides further details about his family life. III J.A. at 1227 (Schmidtgoessling Aff.). Dr. Schmidtgoessling concluded that "[Broom] was profoundly [a]ffected, and early on began to learn to isolate his feelings, learn not to become invested in close relationships because they are so painful, developed a very ambivalent attitude towards women, and struggled with a sense of personal importance and direction." III J.A. at 1230 (Schmidtgoessling Aff.). While this statement certainly provides more information about Broom's development, background, and personality, there is no apparent connection drawn in Dr. Schmidtgoessling's report between these factors and the crimes committed.

[30]This statement was made during pretrial proceedings. *See* XIII J.A. at 5992 (Pretrial Tr. at 56) ("I see nothing we are withholding that would help this individual in any way."). Broom's *Brady* claim is discussed above, and we do not need to discuss this statement further.

[31]During the closing argument, the prosecutor stated that "He killed the little girl, and he probably would have killed the mother and father. He kills in the community, and it's going to go on and on and on." XVII J.A. at 7901 (Trial Tr. at 1809).

anally."[32] Appellant Br. at 70-72. Broom then lists a variety of improper statements made during the sentencing phase of his trial.[33] Appellant Br. at 73.

In analyzing a claim of prosecutorial misconduct, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 126 S. Ct. 163 (2005). In determining whether the statements listed above were proper, there are several guidelines available. First, "[a]dvocates have an obligation to . . . put forth only proper arguments based on the evidence in the record." *Id.* Also, they must obey "the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)), *cert. denied*, 533 U.S. 941 (2001). Finally, we have held that a prosecutor may not make improper comments "designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration." *DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002), *cert. denied*, 540 U.S. 938 (2003). Once conduct is held to be improper, there are four factors that we consider in determining flagrancy:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates*, 402 F.3d at 641. We must adhere to the harmless error standard in reviewing the state court's determination regarding prosecutorial misconduct. *See id.* ("An error is found to be harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'") (quoting *Brecht*, 507 U.S. at 638).

With regard to the statements in the course of the prosecutor's closing argument, the Ohio Supreme Court held as follows:

> Generally, parties have been granted wide latitude in closing arguments. Although we can hardly approve of comments such as, 'He kills in the community and it's going to go on and on and on,' they do not constitute a denial of due process. A complete review of the prosecutor's closing remarks belies the conclusion that the state's improper arguments in any way affected the jury's verdict.

---

[32] During the closing argument, the prosecutor stated that "After he raped her and abused her vaginally and anally, he killed her outside of the car." XVII J.A. at 7899 (Trial Tr. at 1807). Broom explains that the prosecutor acknowledged that two different men were responsible for the sperm found in Middleton's body, and that Middleton's boyfriend was probably the source of the sperm found in Middleton's rectum. XIII J.A. at 5964 (Pretrial Tr. at 28).

[33] The following statements were made during the mitigation phase: "If on the other hand, the aggravating circumstances of the Defendant, the kidnapping, rape and the cold-blooded annihilation of Tryna Middleton . . ." XVIII J.A. at 8003 (Trial Tr. at 1904); "Now, he is telling you 'Send me back for 20 years, so I can come back and do it again.'" XVIII J.A. at 8081 (Trial Tr. at 1990); "Do you think for one moment, do you believe for one moment that any one of you would think that this absurd demonstration of mitigation would outweigh that (indicating)?" XVIII J.A. at 8082 (Trial Tr. at 1991); "After she was out of the car, after he raped her anally and vaginally." XVIII J.A. at 8082 (Trial Tr. at 1991); and "These ridiculous mitigating circumstances that were put on before you which insult your intelligence, actually insult your intelligence . . ." XVIII J.A. at 8084 (Trial Tr. at 1993). In addition, Broom claims that the prosecutor "commented improperly on Broom's unsworn statement as not being under oath and not being subject to cross-examination" and "he called for Broom's execution based in part on his prior rape conviction." Appellant Br. at 73; XVIII J.A. at 8080-81 (Trial Tr. at 1989).

*Broom*, 533 N.E.2d at 693-94 (internal citations omitted).  The state supreme court also concluded that the statements made during the mitigation phase did not deny Broom due process.  *Id*. at 694. The court noted that the prosecutor's comment about Broom's unsworn statement was impermissible in light of an Ohio Supreme Court case decided after Broom's trial;[34] however, the court concluded that "the totality of the prosecutor's remarks is harmless error in light of the overwhelming nature of the aggravating circumstances compared to the mitigation factors."  *Id*.

Several of the improper remarks were made during the prosecutor's closing argument at the mitigation phase.  "Importantly, in the death penalty context, we must distinguish between evidence of the defendant's guilt of the underlying criminal charge and evidence of any attendant aggravating and mitigating circumstances."  *Bates*, 402 F.3d at 648.  "When a prosecutor's actions are so egregious that they effectively foreclose the jury's consideration of . . . mitigating evidence, the jury is unable to make a fair, individualized determination as required by the Eighth Amendment."  *Id*. at 649 (quoting *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002)) (internal quotation omitted).

The prosecutor's behavior was clearly improper in this case.  However, we do not believe that the comments were sufficiently flagrant to justify reversing the Ohio Supreme Court's determination.  Our conclusion is supported by a comparison of the comments made in Broom's case to those made in *Bates*.  The prosecutor's remarks in Broom's case could certainly have prejudiced Broom or misled the jury, especially with regard to the misrepresentation of the rape evidence; moreover, the statements appear to have been made deliberately.  However, most of the prosecutor's comments were general attacks on Broom's overall mitigation case rather than pointed attacks at his witnesses or the defense attorneys as in *Bates*.  *Id*. at 637.  Also, the prosecutor in Broom's case improperly discussed the circumstances of the rape as well as implied that Broom would commit future rapes if he was released from prison, but he did not appeal to the jury's fears and emotions to the same extent as in *Bates*.  In *Bates*, for example, the prosecutor went on at great length and detail as to why a vote for life imprisonment would make the jurors "accomplices" to future murders.  *Id*. at 643-44.

The statements were also not as frequent as in *Bates*, where "both [prosecutors] laced their entire closing argument with personal opinion, attacks on opposing counsel, and undignified and unprofessional appeals to hatred and fear."  *Id*. at 648.  Finally, we do not believe that the improper remarks were so egregious as to "preclude the jury's proper consideration of mitigation."  *Id*. at 649. We do not in any way condone the clearly improper remarks that were made in this case, but we do not think that these improper statements "injected such vitriol into the proceedings, as to question the fairness of the entire sentencing hearing."  *Id*.

In sum, we agree with the district court's conclusion that "[t]he Ohio Supreme Court's analysis is not an unreasonable application of *Darden* and *Donnelly*. . . . [W]hile some of the comments were certainly undesirable, they were not frequent or flagrant enough to undermine a court's confidence in the outcome of the trial."  I J.A. at 243 (Mem. & Order at 79).

---

[34]In *State v. DePew*, 528 N.E.2d 542, 554 (Ohio 1988), *cert. denied*, 489 U.S. 1042 (1989), the state supreme court held that

> [W]here the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses.

The state supreme court concluded that the prosecutor's statement "exceed[ed] the narrowed scope" of the *DePew* rule. *Broom*, 533 N.E.2d at 694.

**F.  Denial of Continuance**

Broom claims that the state trial judge's denial of a continuance was unreasonable and that his counsel was unable to advocate effectively on his behalf because of the lack of time allowed for preparation.  Appellant Br. at 75-76.  Broom's trial counsel were appointed in July 1985, after his previous counsel withdrew.  XVIII J.A. at 8193 (Evidentiary Hr'g Tr. at 68) (Brusnahan Test.).  The trial court granted a continuance to move the trial from August to September 1985.  XIII J.A. at 5951 (Pretrial Tr. at 15).  At this point, the trial judge stated that "[t]here will be no more continuances." XIII J.A. at 5952 (Pretrial Tr. at 16).  Nonetheless, Broom's counsel sought another continuance on September 5, 1985, which the trial court denied.  XVIII J.A. at 8200-01 (Evidentiary Hr'g Tr. at 75-76) (Brusnahan Test.).

The Supreme Court addressed the issue of continuances in *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), which states:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.  Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.  There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

(internal citations omitted).  We have held that "[t]he denial of a defendant's motion for continuance 'amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'"  *United States v. King*, 127 F.3d 483, 486-87 (6th Cir. 1997) (quoting *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985) (internal quotation marks omitted)), *cert. denied*, 528 U.S. 1055 (1999).  "To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense."  *Id*. at 487 (quoting *Gallo*, 763 F.2d at 1523) (internal quotation marks omitted).

In requesting the continuance, Broom's attorneys informed the state trial court that they "had difficulty in obtaining records and other information, which is necessary for a mitigation hearing," XVIII J.A. at 8211 (Evidentiary Hr'g Tr. at 86) (Brusnahan Test.), and that they were also having difficulty in establishing a "working relationship" with Broom, XVIII J.A. at 8201 (Evidentiary Hr'g Tr. at 76) (Brusnahan Test.).  Both the Ohio Supreme Court and the district court found that Broom failed to demonstrate how he was actually prejudiced in the mitigation phase of his trial by the denial of the continuance.  *Broom*, 533 N.E.2d at 695; I J.A. at 245-46 (Mem. & Order at 81-82).[35] Furthermore, the district court stated that "[t]he trial court is not required to grant multiple trial continuances where the need for those continuances is prompted solely by the defendant's own refusal to cooperate with counsel's trial preparation efforts."  I J.A. at 245 (Mem. & Order at 81); *see also United States v. Crawford*, 60 F. App'x 520, 527 (6th Cir. 2003) ("Because Crawford contributed significantly to his own counsel's lack of preparedness, and because counsel represented that he was in fact prepared to provide Crawford with a defense, the district court did not abuse its discretion in denying Crawford's motion to continue the trial date.").  The Ohio Supreme Court reasonably applied *Ungar* in concluding that Broom "was not denied due process when his motion

---

[35]The district court pointed out that "[t]rial counsel stated at the conclusion of the guilt phase that six additional days would be sufficient time to prepare [for mitigation]."  I J.A. at 246 (Mem. & Order at 82); XVII J.A. at 7958 (Trial Tr. at 1867).

for a continuance was denied," and we affirm the district court's judgment as to this issue. *Broom*, 533 N.E.2d at 695.

## G.  "Show-Up" Identification

Immediately after the incident involving Melinda Grissom, the police took Broom for purposes of identification to the hospital where Grissom was being treated.  Appellant Br. at 77. Because Broom was the only suspect presented to the Grissoms at the hospital, he argues that this "'show up' procedure used with both Melinda Grissom and Janet Grissom was 'unnecessarily suggestive and conducive to irreparable mistaken identification.'"[36]   Appellant Br. at 77 (quoting *Kirby v. Illinois*, 406 U.S. 682, 691 (1972)).

In analyzing this issue, the Ohio Supreme Court stated:

> We agree that the showup of the defendant at the hospital, where he was identified by the Grissoms, was both unnecessary and suggestive. . . . Therefore, our concern with the reliability of the identification, deterrence of police misconduct, and the effect on the administration of justice requires us to examine the totality of the circumstances to determine whether the confrontation was so suggestive that there was "a very substantial likelihood of irreparable misidentification."

*Broom*, 533 N.E.2d at 692 (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).  The Supreme Court has set forth the following factors to be considered in determining whether there was in fact such a likelihood of misidentification:  "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  The Ohio Supreme Court found that all of these factors "were favorable in this case":  "Both Grissoms had ample time to view appellant and their attention was completely focused as the mother tried to rescue her daughter.  The descriptions given to the police prior to the confrontation matched the appellant.  Finally, the identification was emphatically positive, and it occurred very shortly after the crime."  *Broom*, 533 N.E.2d at 692.

Broom's contention that the Ohio Supreme Court's application of *Manson* and *Neil* was unreasonable is without merit, and we affirm the district court's judgment denying relief as to this claim.

## III.  CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment denying Broom habeas relief.

---

[36]We note that this statement quoting *Kirby* is the full extent of Broom's argument as to this claim.  Appellant Br. at 77.