<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 12a0388n.06

**No. 09-2347**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 10, 2012*

LEONARD GREEN, Clerk

**RONALD SIMPSON,**

      **Petitioner-Appellee,**

**v.**

**MILLICENT WARREN, Warden,**

      **Respondent-Appellant.**

                                /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN**

**BEFORE:**    **CLAY and STRANCH, Circuit Judges; BARRETT, District Judge.**[*]

      **CLAY, Circuit Judge.** Respondent Millicent Warren, Warden at the Thumb Correctional

Facility in Michigan, appeals the district court's order granting Petitioner Ronald Simpson a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, we **AFFIRM** the

district court's decision.

**STATEMENT OF FACTS**

**I.**    **Factual Background**

      On October 29, 1985, Petitioner Ronald Simpson and three associates—Charles Hughes,

Jeffrey Sharp, and Shelton Smith (the "co-conspirators")—were cruising around Flint, Michigan, in

---

[*]Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

Petitioner's maroon Buick Regal (the "Regal") armed with several firearms, including Petitioner's .9 millimeter automatic pistol and sawed-off shotgun.

Around 11 a.m., the co-conspirators stopped at the Oakview apartment complex on Detroit Street ("Oakview"). Allegedly, the co-conspirators intended to steal cocaine from Oakview resident Marcus Lane. Petitioner and Hughes entered Oakview armed, while Sharp and Shelton waited in the Regal. It turned out that Lane was not home and that Petitioner and Hughes did not find any cocaine, but they stole other items at gunpoint from the three females who were present in the apartment.

As the co-conspirators drove away from Oakview, they noticed that they were being followed. The co-conspirators did not know that the person following them was a plainclothes police officer, Lieutenant Koger. Lieutenant Koger had observed Petitioner and Hughes enter Oakview and later return to the Regal, after which the car sped off. Lieutenant Koger had called another police officer, Officer Weston, for backup. Suspicious of the Regal, Officers Koger and Weston followed the Regal down several streets in separate vehicles. The co-conspirators then noticed they were being followed. At one point, both officers lost sight of the Regal.

Officer Weston was the first officer to reestablish contact with the Regal when he found it parked in a private residential driveway. Officer Weston approached the Regal in his unmarked car. Petitioner exited the Regal and fled from the scene as someone opened fire on Officer Weston. Officer Weston, who could not determine whether Petitioner or a passenger in the Regal was firing on him, returned fire on the Regal. Lieutenant Koger arrived at the scene as Petitioner fled. As the Regal pulled away, the co-conspirators shot at the officers through the sunroof.

2

## II.    Procedural History

Petitioner was arrested and charged with: (1) assault with intent to commit murder of Officer Weston, and (2) possession of a firearm during the commission of a felony. In a separate case, Petitioner was charged with armed robbery at Marcus Lane's apartment. The other co-conspirators were also charged, but Sharp and Smith entered into plea agreements in which they agreed to testify against Petitioner and Hughes.

Beginning on June 10, 1986, Petitioner and Hughes were tried together with separate juries. Because Petitioner's charges arose from conduct that occurred before he fled the scene, and Hughes' charges arose from conduct that occurred after Petitioner fled the scene, the trial was organized to ensure that each jury would hear testimony only relevant to its defendant's charges. During the prosecution's case, Petitioner's jury was present for witness testimony recounting events until the point that Petitioner fled the crime scene. When a witness proceeded to recount subsequent events, Petitioner's jury left the courtroom, and Hughes' jury remained. Because there was some temporal overlap between the facts relevant to Petitioner's and Hughes' crimes, both juries were present for certain witnesses' testimony. Although the trial court made an effort to allow each jury to hear only the evidence relevant to the applicable defendant, Petitioner's jury did hear some evidence relevant only to Hughes' case.

At trial, several pieces of inculpatory evidence were presented against Petitioner, including the testimony of Officer Weston and Lieutenant Koger, as well as that of co-conspirators Smith and Sharp, who stated that they observed Petitioner shoot at Officer Weston with a .9 millimeter automatic pistol. The trial judge attempted to exclude evidence and testimony regarding the alleged

robbery of Marcus Lane's apartments from Petitioner's trial, since Petitioner was not on trial for that conduct. However, the trial court permitted presentation of some evidence regarding this uncharged offense for the narrow purpose of demonstrating Petitioner's motive and intent to shoot at the police. The trial court instructed the jury concerning the limited purposes for which the evidence about the armed robbery could be used.

Petitioner was convicted on both counts of the indictment. The trial court sentenced him to between 30 and 50 years of incarceration for the assault conviction, along with a consecutive sentence of two years of incarceration for the firearm conviction. On February 19, 1987, Petitioner filed a timely motion for a new trial, which was denied. The separate robbery charge against Petitioner was dismissed.

Petitioner then filed a direct appeal, and the Michigan Court of Appeals affirmed his conviction on June 23, 1988. The Michigan Court of Appeals concluded that the evidence concerning the armed robbery was properly admitted under Michigan Rule of Evidence ("MRE") 404(b) or to explain the circumstances surrounding the shooting. Relevant to Petitioner's claim of prosecutorial misconduct, the court stated, in pertinent part:

> To the extent this issue involves the prosecutor's questions regarding the later shoot-out, we have already found that the testimony was not reversible error. . . . To the extent the argument concerns testimony from the armed robbery victim of [Petitioner's] activities, testimony concerning the armed robbery was generally admissible under . . . MRE 404(b) . . . [or res gestae], and therefore there was no error.
>
> Furthermore, [Petitioner's] contention that the prosecutor's closing argument contained improper comments and speculation is without merit. Defense counsel did not object to these comments either during or subsequent to summation. In the absence of objection, appellate review is foreclosed unless the prejudicial effect was so great that it could not have been cured by instruction and failure to consider the

4

> issue would result in a miscarriage of justice. . . . A prosecutor is free to relate his theory of the case and to argue the evidence and any reasonable inferences to be drawn from it. . . . A review of the entire argument does not indicate that a miscarriage of justice will result if we decline to review this issue. Any error could have been cured with an appropriate instruction.

On February 1, 1989, the Michigan Supreme Court denied Petitioner leave to appeal.

Subsequently, Petitioner filed several post-conviction motions in the Michigan state courts. Petitioner filed a motion for relief from judgment, which was denied on April 6, 1994; a motion for leave to appeal to the Michigan Court of Appeals, which was denied on June 7, 1996; a motion for rehearing in the Michigan Court of Appeals on June 21, 1996, which was denied on August 1, 1996; a delayed application for leave to appeal his motion for relief from judgment to the Michigan Supreme Court on September 20, 1996, which was denied on May 30, 1997; a motion for reconsideration of this May 30, 1997 denial on June 9, 1997, which was in turn denied on August 29, 1997; a second motion for relief from judgment in the Michigan trial court on October 28, 1997, which was denied on December 22, 2003; a motion for reconsideration of the December 22, 2003 denial, and an application for leave to appeal the denial to the Michigan Court of Appeals on February 9, 2004, which were denied on March 22, 2004, and July 15, 2004, respectively; a motion for rehearing in the Michigan Court of Appeals on August 1, 2004, which was denied on September 8, 2004; and an application for leave to appeal to the Michigan Supreme Court on October 27, 2004, which was denied on May 31, 2005.

On April 24, 2006, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the district court. In his habeas petition, Petitioner asserted the following grounds for relief: (1) that the Michigan courts erred in relying upon Michigan Court Rule 6.508(D) in

denying his motions for relief from judgment; (2) that the trial court erred in failing to sever his trial from Hughes' trial; (3) that the prosecution suppressed impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (4) that his trial counsel provided ineffective assistance; (5) that his appellate counsel provided ineffective assistance; (6) that his sentence violated due process; and (7) prosecutorial misconduct. The district court granted Petitioner a writ of habeas corpus on his prosecutorial misconduct claim, and denied Petitioner's remaining grounds for habeas relief. Respondent timely appealed.

## DISCUSSION

### I. Standard of Review

"In reviewing the district court's decision, we review legal conclusions *de novo* and findings of fact for clear error." *Haliym v. Mitchell*, 492 F.3d 680, 689 (6th Cir. 2007). Petitioner filed his petition for a writ of habeas corpus in 2006, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments to 28 U.S.C. § 2254. Our review of the district court's decision is governed by the deferential habeas standard codified in AEDPA. Section 2254(d) states that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to . . . clearly established federal law" pursuant to § 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or

if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A state court decision "involves an unreasonable application of clearly established federal law" pursuant to § 2254(d)(1) if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case. Clearly established Federal law, as determined by the Supreme Court of the United States, refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Id*. at 763 (quoting *Williams*, 529 U.S. at 412).

The Supreme Court recently decided a series of cases elaborating on the scope of AEDPA deference. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *Walker v. Martin*, 131 S. Ct. 1120 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011); *Premo v. Moore*, 131 S. Ct. 733 (2011); *Renico v. Lett*, 130 S. Ct. 1855 (2010). These cases highlight AEDPA's important role as "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington*, 131 S. Ct. at 787; *see also Cullen*, 131 S. Ct. at 1398; *Walker*, 131 S. Ct. at 1120; *Premo*, 131 S. Ct. at 733; *Renico*, 130 S. Ct. at 1855. The AEDPA standard "is a difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen*, 131 S. Ct at 1398 (internal quotations and citations omitted). The Court thus reiterated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (internal quotation omitted).

Nonetheless, AEDPA does not foreclose federal habeas review of state court convictions and sentences. As the Supreme Court emphasized, AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. Rather, federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems." *Id*.

AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id*. Thus, "[a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87. Therefore, in evaluating a habeas claim under AEDPA, a federal court must "determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id*. at 786.

While AEDPA always requires habeas courts to accord state court decisions significant deference, the nature of the deference is tailored to the legal rule underlying that habeas claim. *See, e.g. Renico*, 130 S. Ct. at 1864. "Evaluating whether a rule application [by a state court] was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 131 S. Ct. at 786. As this Court has recognized, the AEDPA "deference accorded the state court's determination" in

8

ineffective assistance of counsel cases "is even greater in light of the generalized nature of the *Strickland* inquiry." *Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011); *see also Premo*, 131 S. Ct. at 740 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial."(quoting *Harrington*, 131 S. Ct. at 788)); *Renico*, 130 S. Ct. at 1865 ("[T]he standard applied [to decide] whether the [trial] judge exercised sound discretion [in declaring a mistrial] . . . is a general one, to which there is no plainly correct or incorrect answer in this case.").

The recent cases decided by the Supreme Court dealt with application of general rules, specifically, evaluating whether counsel provided ineffective assistance, *see, e.g.*, *Cullen*, 131 S. Ct. at 1403; *Harrington*, 131 S. Ct. at 788; *Premo*, 131 S. Ct. at 740, and determining whether the trial court properly declared a mistrial. *See Renico*, 130 S. Ct. at 1865. A habeas court considering alleged violations of those generalized rules reviews the decisions of two actors: (1) the actor in the first instance, such as counsel or the state trial court, and (2) the state court's evaluation of the constitutional reasonableness of that conduct.

This case is different from the circumstance evaluated in *Cullen*, *Harrington*, *Premo*, and *Renico* in an important respect. Whereas those cases involved general rules that required a habeas court to accord state decisions additional deference, *see Harrington*, 131 S. Ct. at 786, this case involves a claim of prosecutorial misconduct, which is governed by a standard that affords a prosecutor less discretion and thus affords state courts less deference. While it is true that "state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing . . . is necessarily imprecise," *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006), prosecutorial misconduct claims do not afford states discretion over and above the usual

9

ability that state courts have to exercise their judgments in determining constitutional questions. *Cf.*

*Renico*, 130 S. Ct. at 1865 (stating that because a trial judge has significant discretion in determining

whether to declare a mistrial, a reviewing court must accord significant deference to the trial judge's

exercise of his "sound discretion").

## II. Analysis

Petitioner claims that he is entitled to a writ of habeas corpus because the prosecutor at his

trial engaged in flagrant misconduct. Specifically, Petitioner asserts that the prosecutor committed

misconduct by: (1) eliciting testimony regarding Petitioner's alleged participation in an armed

robbery of Marcus Lane's apartment; (2) introducing evidence regarding the shooting after Petitioner

fled the scene; and (3) making inappropriate statements during closing statements.

### A. Procedural Default

Respondent argues that Petitioner defaulted his misconduct claim arising from improper

testimony the prosecutor adduced, but that argument is incorrect. We cannot grant habeas relief on

a procedurally defaulted claim. *Haliym*, 492 F.3d at 690. A petitioner's federal claim is procedurally

defaulted if the state court's rejection of that claim "rests on a state-law ground that is both

independent of the merits of the federal claim and an adequate basis for the state court's decision."

*Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011) (internal quotations and citations omitted).

As an initial matter, we note that Respondent does not argue that Petitioner procedurally

defaulted his claims based on the prosecutor's closing arguments. "Procedural default is normally

a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the

defense thereafter." *Cristini v. McKee*, 526 F.3d 888, 898 (6th Cir. 2008) (internal alterations

omitted). Moreover, in asserting a procedural default defense, Respondent must "identif[y] with specificity which statements are allegedly defaulted." *Slagle*, 457 F.3d at 514. Respondent declines to argue that Petitioner defaulted his misconduct claims arising from the prosecutor's closing argument, and so Respondent has waived that defense.

Respondent also argues that Petitioner defaulted claims based on the prosecutor's cross-examination of Shirley Williams, but that argument is incorrect. During the prosecution's examination of Shirley Williams, an alleged victim of the robbery, the prosecutor elicited testimony that Petitioner had put a gun to her head during the robbery. Since the trial court instructed the prosecutor to limit Williams' testimony, Petitioner argues that the prosecutor committed misconduct by asking the open-ended question. Respondent argues that Petitioner defaulted this claim arising from questions adduced from a witness.

To determine whether Petitioner's claim is procedurally defaulted, we "look to the last explained state court judgment[] to determine whether relief is barred on procedural grounds." *Stone*, 644 F.3d at 346 (internal quotation omitted). A claim is procedurally defaulted only if "state courts actually enforced the state procedural sanction." *Id.* (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). Thus, in order for default to bar a petitioner's prosecutorial claim, it must be clear to us which statements underlying the petitioner's claim the state court decided by relying on a procedural bar. *See Slagle*, 457 F.3d at 515. For example, in *Slagle*, we noted that "a prosecutorial misconduct claim requires evaluation of the cumulative effect of improper comments made during the course of an entire trial," and that, as a result, the state court's failure to identify the sub-claims

11

the petitioner was procedurally barred from raising prohibited us from concluding any of the petitioner's sub-claims were defaulted. *Id.*

The same reasoning applies to Petitioner's prosecutorial misconduct claim arising from Williams' testimony. Notwithstanding Petitioner's failure to object to Williams' testimony at trial, the Michigan Court of Appeals reviewed in full the propriety of the testimony regarding the armed robbery. Therefore, to the extent that Petitioner's trial counsel's failure to object to the prosecutor's statements constitutes grounds for procedural default, this procedural bar was not actually enforced, and we may review Petitioner's claim. *See id*.

## B.    Legal Framework

We have often repeated the Supreme Court's admonition from *Berger v. United States*, 295 U.S. 78 (1935), that a prosecutor

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88; *see*, *e.g., United States v. Carter*, 236 F.3d 777, 786 (6th Cir. 2001).

In reviewing a claim of prosecutorial misconduct, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren*, 440 F.3d at 778 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "When reviewing challenges to a prosecutor's remarks at trial, this Court examines the prosecutor's

comments within the context of the trial to determine whether such comments amounted to prejudicial error." *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007) (internal quotations and citations omitted). Thus, "[t]here are instances where a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991).

We engage in a two-step inquiry to determine whether prosecutorial misconduct rises to the level of unconstitutionality. "To satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006). This Court has provided some guidance regarding the nature of improper prosecutorial conduct:

> In determining whether the [prosecutor's] statements . . . were proper, there are several guidelines available. Advocates have an obligation to put forth only proper arguments based on the evidence in the record. Also they must obey the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jury.

*Id*. Regarding the second factor, flagrancy, we have explained that:

> [o]nce conduct is held to be improper, there are four factors [to] consider in determining flagrancy: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Id*. Even if the statements were not flagrant, this Court will nevertheless find prosecutorial misconduct "if (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the [trial] court failed to give a curative instruction." *United States v. Abboud*, 438 F.3d 554, 584 (6th Cir. 2006).

## C.    Application

We evaluate the various bases of Petitioner's prosecutorial misconduct claim together, since "a prosecutorial misconduct claim requires evaluation of the cumulative effect of [prosecutorial] improp[riety] . . . during the course of an entire trial." *Slagle*, 457 F.3d at 515.

Petitioner first points to the prosecutor's improper introduction of prejudicial evidence regarding Petitioner's role in the alleged armed robbery of Marcus Lane's apartment. The trial court allowed Shirley Williams, an alleged victim of the robbery, to testify briefly about the robbery in order to provide jurors factual context for the alleged assault. The prosecutor's colloquy with the court and the witness prior to the testimony makes it clear that the prosecutor knew that the scope of Williams' testimony about the robbery would be small. In a hearing outside the juries' presence, the trial court explained that he would "not permit a lengthy discussion" about the robbery but would "allow background material." The court emphasized the limited scope of Williams' testimony, noting that witnesses "have a tendency to volunteer much information" and that the court "wanted to prevent that . . . from occurring."

Before Williams testified, defense counsel requested a hearing without the juries present "to find out [to] what extent the prosecutor is going to go" and to learn the substance of Williams' expected testimony about the armed robbery. The prosecutor's colloquy with Williams during this hearing demonstrated that he understood the limited scope of Williams' intended testimony. The prosecutor asked Williams not to go "into a lot of detail" and more than once to answer "[j]ust yes or no." At the conclusion of the proffer, the prosecutor stated: "[T]hat's basically all I wish to put before the jury. . . . That's as brief as I want to be." The prosecutor did not ask Williams during the

14

proffer if Petitioner had threatened her with a gun. As the juries were returning to the courtroom, the prosecutor instructed the witness: "Surely, I'm not going to ask you about the search. They come up to the door, like I asked you, 'Did they take anything?' 'Yes.' 'And did they leave?' Okay? I don't want to go into the detail." The witness responded, "Okay." The prosecutor then stated: "Now, if they ask you, answer their question, whatever they ask you, okay?" The witness answered, "Uh-huh."

When the juries returned, however, the prosecutor did not ask Williams "yes" or "no" questions as he assured the court, the witness, and defense counsel he would:

> Q: How many people did you see when you first looked out [after someone knocked on the door]?
> A: One.
> Q. All right, and after this person asked you about [Marcus Lane], what happened?
> A: He snatched the door out of my hand, the screen door.
> Q: All right. What happened then?
> A: Then he came in.
> Q: Okay, and what happened next?
> A: And he put [a] gun to my head, told me to sit down and don't move.
> Q: Put the gun—
> A: —to my head.
> Q: Do you see this person in court today?
> A: Yes. [Describes Petitioner.]

The prosecutor's open-ended questions opened the door for Williams to volunteer that Petitioner put his gun to her head. The prosecutor's line of questioning flagrantly disregarded the court's instructions to limit Williams' testimony, and once that prejudicial statement was before Petitioner's jury, the prosecutor did not stop discussing the topic in order to minimize any damage. Instead, the prosecutor asked Williams to repeat her statement so her testimony would obtain greater emphasis.

15

Then, during the remainder of trial, the prosecutor repeatedly reminded the jury, over defense objections to all of the armed robbery evidence, that Petitioner placed a gun to Williams' head.

The prosecutor also needlessly belabored the robbery during his examination of co-conspirator Sheldon Smith. Specifically, the following line of questioning during Smith's examination, to which Petitioner's counsel objected during trial, was improper and flagrant:

> Q: Now did [the alleged armed robbers] say how they were going to take the cocaine [from Marcus Lane's apartment]?
>
> * * * * *
>
> Q: Who was going into Marcus[ Lane]'s apartment [to] take the cocaine?
> A: [Hughes] and [Petitioner].
> Q: All right. Did [Hughes] or [Petitioner] say how they were going to take the cocaine?
> A: They didn't say how . . . . They got out [of] the car. They had the guns, so evidently they [were] going to have to use force.
>
> * * * * *
>
> Q: And when [Petitioner] and Mr. Hughes . . . got out of the car [to go to Marcus Lane's apartment], that left not only your gun in the car but there was a shotgun in the car?
> A: Yes.
> Q: And Jeff Sharp was in the car with you, right?
> A: Yes.
> Q: And you knew that some cocaine was going to be taken [by] men with guns, didn't you?
> A: Yes.

The prosecutor's improper and flagrant line of questioning continued during his cross examination of Petitioner, in spite of objections from defense counsel:

> Q: You went in [to Oakview] with that .9 millimeter gun, too, didn't you?
> A: No, sir.
> Q: [You d]idn't go in there with that .9 millimeter? Tell the jury how you went in[to] the [Oakview] apartments.

16

A:    I went in[to] the [Oakview] apartment to talk to a guy[,] [Marcus Lane,] that owed me some money, sir.

\* \* \* \* \*

Q:    Are you telling this jury that you did not go in there knowing that Marcus Lane was a drug dealer, to rob that place?
A:    I didn't know Marcus Lane was a drug dealer.
Q:    You didn't know? All right? Why did you have this weapon on you?
A:    Why? I didn't have it on me.
Q:    You had it on you, you testified to—over by the garage.
A:    Well, the gun was in the car from that morning.
Q:    You are testifying that you did not take this gun into that particular apartment and put it to Shirley Williams's head and rob her, is that what you are testifying to?

\* \* \* \* \*

Q:    Do you remember Shirley Williams' testimony that you came in with a black gun and put it to her head, do you remember that?
A:    Yes, sir.
Q:    This is a black gun, is it not?
A:    Yes.

The prosecutor also improperly adduced testimony regarding the shootout in which Petitioner was not involved. Petitioner was not on trial for the shooting that occurred after he fled, but, in questioning Lieutenant Koger, the prosecutor elicited testimony in the presence of petitioner's jury regarding the subsequent shootings:

Q:    Okay. So I take it you started to chase this Regal in your van and Officer Weston was behind you?
A:    Yes.
Q:    All right, and these other shots that you have described earlier that were fired?
A:    That's correct.
Q:    Two different people?
A:    Yes.
Q:    All right. What did you do in response to those shots?

17

A:   Well, the second time that the subject shot through the sunroof, and the passenger shot, the van was struck both times.

The prosecutor's closing arguments also included several comments aimed at inflaming the jury's passion. In one instance, the prosecutor asked rhetorically, "But if you look at a .9 millimeter, point it at a person and you shoot it intending to hit that person, don't you intend to kill him? I mean just because you miss, do we have to bring in Weston's dead body and throw it before you to get assault with intent to murder?" Worse still, the prosecutor warned the jury that "it would be very sad if we had to come in here and dump a dead body in front of you to get that point across. It's assault with intent to murder." The prosecutor further stated:

> [Petitioner] said . . . [he] looked the same as [he] did back on [the date of the crime]. . . . I'll leave that to your determination. But I suggest to you, ladies and gentlemen, you are judging the facts. He's not the same person before you in this trial. He's not acting like he's pointing a gun before you in this trial. You're not seeing that, are you? You are not seeing that. You are not seeing [Petitioner's] evidence that shows he really was—the type of man who knows about all of this ammunition and guns, that hangs out with Hughes and Sharp and Smith, the type of man that carries this gun . . . and points it and shoots it. That's not the [Petitioner] now you are seeing, is it? Sometimes it's hard to visualize, especially when the attorney has him take the pictures . . . but it allows him to get close to you and it may influence you, because you might think he's a nice looking fellow and overlook what he did on [the date of the crime].
>
> *   *   *   *
> Don't get hung up about that little aspect of pointing that gun with assault with intent to murder in that driveway . . . because when you know more about him, the gun, to rob him, going over to Lisa Key's, telling her what he had just done and hiding the guns in the bag, and when you know all the facts you get a better picture of him on [the date of the crime]. I suggest that total picture, ladies and gentlemen, makes out a person who, but for a bad aim, could very well be before you as a killer, could very well be before you as a killer because if a person shoots at another person intending to hit, aim and kills him and he admits that, does that really make his intent any less? Does it make his intent any less?

The Michigan Court of Appeals unreasonably applied clearly established federal law by rejecting Petitioner's claims of error arising from all of these comments. The appeals court concluded that the testimony and comments regarding the armed robbery and shootout were admissible under Michigan law, but it ignored the question of whether the inflammatory questions and arguments "so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren*, 440 F.3d at 778. The prosecutor's questions and comments rendered Petitioner's trial unfair, and the appeals court's determinations to the contrary—that the prosecutor's arguments did nothing more than "relate his theory of the case," and "argue the evidence and any reasonable inference to be drawn from it"—unreasonably applied due process requirements to Petitioner's trial.

As the state post-conviction court explained, this prosecutor gained "a track record of reversals and appellate comments" regarding his conduct in five cases. Among those cases was *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000), in which we granted a conditional writ because this prosecutor "extensively berated [the petitioner's] character before the jury" and argued facts not in evidence. *Id.* at 695–97. And, once again, we are faced with similar conduct by this prosecutor. The prosecutor's statements were placed before the jury for precisely the unconstitutional purposes of "suggest[ing] that the jury could consider [a defendant's] bad character as a thumb on the scale in favor of a finding of guilt," *Hodge*, 426 F.3d at 385, and "flam[ing] the passions and prejudices of the jury." *Abboud*, 438 F.3d at 584. The prosecutor's statements were both improper and flagrant. It was unreasonable for the Michigan Court of Appeals to conclude otherwise.

### 1.     Impropriety

In determining whether the prosecutor's questioning regarding the armed robbery and shootout exceeded the limited purpose for which this evidence was admissible, it is important to note that we granted habeas relief in *Washington* on the basis of prosecutorial misconduct when, although certain "evidence . . . was admissible for certain limited purposes, the prosecutor went far beyond the bounds of permitted conduct when presenting that evidence to the jury." *Washington*, 228 F.3d at 699. In this case, evidence of the alleged armed robbery was admissible for the limited purposes of demonstrating Petitioner's intent and motive to shoot at Officer Weston. However, instead of limiting his questioning to the appropriate subject matter, the prosecutor repeatedly elicited and highlighted evidence that Petitioner put a gun to Shirley Williams' head during the course of the alleged armed robbery.

While Petitioner's participation in the armed robbery may have been relevant for the purpose of demonstrating his motive to shoot at Officer Weston, this particular inflammatory fact was not, in itself, demonstrative of Petitioner's motive. Rather, the prosecutor's emphasis on Williams' testimony could only have been "calculated to incite the passions and prejudices of the jury," constituting improper prosecutorial behavior. *Broom*, 441 F.3d at 412. Even the prosecutor admitted at one point that his questioning exceeded permissible bounds. (R. 21, Trial Tr. 6/20/1986 at 12 ("I admit I shouldn't have got into that.").)

The prosecutor's statements during closing arguments were similarly improper. In assessing whether a prosecutor's statements during closing arguments constituted misconduct, this Court considers the fact that the jury heard these comments shortly before deliberations is a significant

factor. *See Carter*, 236 F.3d at 788. A prosecutor's statements have "great potential for misleading the jury" during its deliberation, "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Girts*, 501 F.3d at 759 (internal citations and quotations omitted). For this reason, we consider it significant that the prosecutor compounded his prejudicial questions with prejudicial statements to the jury shortly before it would begin deliberating.

This Court has explained that "a prosecutor is allowed to argue reasonable inferences from the evidence." *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). This includes asserting, based on facts and inconsistencies in evidence, that a defendant is lying. *See, e.g., United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). However, a prosecutor may not urge the jury to "consider [a defendant's] bad character as a thumb on the scale in favor of a finding of guilt." *Hodge*, 426 F.3d at 385. "A fundamental rule of evidence is that a defendant's bad character cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." *Washington,* 228 F.3d at 699. Thus, "when a prosecutor dwells on a defendant's bad character in this prohibited manner, [this Court] may find prosecutorial misconduct." *Id*. Additionally, a prosecutor may not make statements calculated to "flame the passions and prejudices of the jury." *Abboud*, 438 F.3d at 584; *see also Solivan*, 937 F.3d at 1151.

The prosecutor twice stated that "dump[ing]" and "throw[ing]" Officer Weston's "dead body" before the jury should not be a prerequisite to convicting Petitioner. Because Officer Weston was not only alive, but testified at Petitioner's trial, these statements were designed to inflame the jury's passions, and neither stated the law nor the facts relevant to Petitioner's case. Furthermore,

the prosecutor's attack on Petitioner's character, as well as his attempt to distinguish Petitioner's appearance at trial and his appearance at the time of the crime, were blatant appeals for the jury to "consider [Petitioner's] bad character as a thumb on the scale in favor of a finding of guilt." *Hodge*, 426 F.3d at 385. These statements were thus clearly improper.

### 2.    Flagrancy

The prosecutor's statements were also flagrant. First, as previously discussed, "prosecutorial statements may have great potential for misleading the jury." *Girts*, 501 F.3d at 759. Thus, there is a serious risk that the prosecutor's improper questioning regarding the armed robbery, the prosecutor's statements regarding Petitioner's character, and the prosecutor's inflammatory statements regarding the need to "dump" Officer Weston's dead body before the jury, did indeed influence the jury.

Second, the prosecutor's misconduct was not isolated. Rather, the prosecutor's questioning of several witnesses about the armed robbery and shootout exceeded the permissible scope of the evidence, and improper statements were peppered throughout the prosecutor's closing argument. This fact also speaks to the third flagrancy factor, "whether the remarks were deliberately or accidentally made." *Broom*, 441 F.3d at 412. This Court has explained that "repeated comments demonstrate that the errors were not inadvertent." *Girts*, 501 F.3d at 760.

Finally, contrary to the state court's conclusion, the evidence against Petitioner was not sufficiently strong to overcome the prejudice that the prosecutor's comments and questions caused Petitioner. We have granted a petitioner a writ of habeas corpus based on prosecutorial misconduct where "the case against [the defendant] was relatively straightforward and strong." *Boyle v. Million*,

201 F.3d 711, 717 (6th Cir. 2000). The evidence against Petitioner hardly meets that description: the testimony of two of Petitioner's co-defendants, who testified in exchange for the dismissal of charges, and a co-defendant's girlfriend formed the main evidence against Petitioner; Officer Weston fired shots into the Regal because he thought shots were coming from inside the car, though Petitioner was outside the car; and Officer Weston testified for the first time at trial that Petitioner's gun was smoking when he fled the scene, after omitting that fact in his police report and at the preliminary hearing.

Moreover, the prosecutor's misconduct undercut Petitioner's sole defense theory. Petitioner testified on his own behalf, and his principal defense was his own testimony. This Court has explained that a "a prosecutor may not make improper comments designed to completely undercut the defendant's sole [defense] theory, effectively denying him fair jury consideration." *Broom*, 441 F.3d at 412. The prosecutor's statements impugning Petitioner's character effectively impeached him and averted any impulse the jury may have had to believe his testimony. While a prosecutor is free to impeach a defendant's testimony on legitimate evidentiary grounds, he may not do so by impugning a defendant's character. Here, the prosecutor's derogation of Petitioner's character tipped the balance of evidence in Petitioner's favor. Our judgment that the evidence against Petitioner was not "straightforward and strong" and that the prosecutor's comments improperly weakened a legitimate theory from Petitioner convinces us that the prosecutor's improper questions and comments were flagrant. *Boyle*, 201 F.3d at 717.

The Michigan Court of Appeals found that the extent to which the prosecutor elicited testimony regarding the armed robbery was not a violation of Michigan law, and that the prosecutor's

improper statements during closing arguments did not result in a "miscarriage of justice." However, the state court failed to grasp the breadth of the prosecutor's improper questions and statements, and no reasonable jurist who considers the prosecutor's misconduct and the actual weight of the evidence against Petitioner would conclude that Petitioner's right to due process was vindicated. Because these repeated inflammatory and improper statements were largely calculated to incite the jury's passions, and undermine Petitioner's sole proof of innocence, it was unreasonable for the Michigan Court of Appeals to dismiss Petitioner's prosecutorial misconduct assignment of error. Petitioner is thus entitled to a writ of habeas corpus on this ground.

## CONCLUSION

The cumulative effect of the prosecutor's improper and flagrant questioning regarding the armed robbery and shootout and his prejudicial comments during closing arguments deprived Petitioner of a fair trial in violation of his due process rights. Accordingly, we conclude that the state court's decision involved an unreasonable application of clearly established federal law on prosecutorial misconduct, as determined by the Supreme Court. 28 U.S.C. § 2254(d); *Berger*, 295 U.S. at 88; *Darden*, 447 U.S. at 181. The prosecutor's misconduct deprived Petitioner of his constitutional right to due process, and he is entitled to a writ of habeas corpus. *See Washington*, 228 F.3d at 709.

We **AFFIRM** the decision of the district court, and grant Petitioner a writ of habeas corpus. The Petitioner is ordered released from custody unless the State of Michigan commences a retrial of Petitioner within 180 days in accordance with the requirements of this opinion.